Filed 6/30/26  In re R.R. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E087139 |
| Plaintiff and Respondent, | (Super.Ct.No. J288815) |
| v. | OPINION |
| C.R., | |
| Defendant and Appellant. | |
| In re R.R., a Person Coming Under the Juvenile Court Law. | E087502 |
| | (Super.Ct.No. J288815) |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| C.R. et al., Defendants and Appellants. | |

1

APPEAL from the Superior Court of San Bernardino County. Cara D. Hutson, Judge. Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant for C.R.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant for A.H.

Laura Feingold, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

C.R. is the biological mother of seven-year-old R.R.H. (R.)[1] and 15-year-old S.R.H (S.).[2] A.H. is their adoptive mother.[3] Each mother has filed an appeal of the juvenile court's order terminating their parental rights following a hearing pursuant to

---

[1] R.R.H. is at times referred to as "R.R." and other times as "R.H."

[2] S.R.H. is not a subject of this appeal. S.R.H. is at times referred to as "S.H."

[3] C.R. and A.H. were in a registered domestic partnership under Family Code section 297.

Welfare and Institutions Code[4] section 366.26.[5]  On appeal, both mothers contend that the juvenile court failed to apply the beneficial parent-child relationship exception to adoption pursuant to section 366.26, subdivision (c)(1)(B)(i).  C.R. additionally contends the juvenile court abused its discretion in denying her section 388 petition seeking additional reunification services.  We find no error and affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[6]

The family came to the attention of the San Bernardino County Children and Family Services (CFS) in December 2020 due to the mothers ongoing and contentious custody dispute over the children in family law proceedings.  At that time, CFS provided the mothers with referrals for counseling to address the relationship concerns and their inability to co-parent.

In February 2021, the family law court temporarily granted primary legal and physical custody of S. to A.H., and primary legal and physical custody of R. to C.R.  C.R. was granted visitation with S. on alternate weekends while A.H. was granted

---

[4]  All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[5]  On our own motion, we consolidated case No. E087139 with case No. E087502 for briefing, argument, and decision.

[6]  The factual and procedural background is taken from C.R.'s prior appeals in case Nos. E078019 and E085273 unless otherwise noted.  (See *In re R.H.* (May 25, 2022, E078019) [nonpub. opn.] (*R.H.*); *C.R. v. Superior Court of San Bernardino County* (Apr. 11, 2025, E085273) [nonpub. opn.] (*C.R.*).)  We took judicial notice of the records in case No. E078019.  And on our own motion, we incorporated the record in case No. E085273 with the record in case No. E087139.

alternate weekend visits with R.  C.R. and A.H. were ordered to communicate by means of Talking Parents.

In March 2021, CFS received six different referrals with allegations of physical and emotional abuse of S. by A.H.  The referral also indicated that S. had been placed on involuntary section 5150 holds in December 2020 and March 2021 after he had expressed suicidal ideations.  The sixth referral alleged general neglect to S. by A.H. after the child refused to return to A.H.'s custody during the custody exchange.  When S. was interviewed, he appeared traumatized, exhibited behavioral outbursts, and reported physical abuse in both homes.  S. also disclosed being "coached" in both homes.

On March 31, 2021, a social worker held an informal meeting with both mothers to address the concerns of emotional abuse to the children, to promote effective communication between the mothers, and to discuss a third-party arrangement for custody exchanges.  CFS's attempts to work with the mothers, however, were to no avail, and by April 2021, the custody exchanges had not improved.  C.R. had violated family law orders multiple times by refusing to exchange the children with A.H.  She had also transferred S.H.'s medical card to a county where he did not reside, thereby preventing A.H. from getting him mental health services.  The social worker believed C.R.'s conduct negatively impacted S.'s behaviors and emotional state.  C.R. and A.H. also had prior child welfare histories.  A.H.'s eldest child was removed from her care and her parental rights as to that child were terminated in 2008.

Despite A.H.'s prior child welfare history, the social worker believed that A.H. was a safer and more protective parent at the time and obtained a warrant to detain the children from C.R. while maintaining them with A.H. The social worker noted that A.H. was cooperative with CFS, enrolled S. in programs to address his behaviors and mental health and attempted to change the child's medical coverage to the county of residence. C.R., on the other hand, repeatedly violated prior family law court orders, made excessive calls to CFS and law enforcement with allegations of child abuse in A.H.'s home, and undermined effective co-parenting efforts.

On April 8, 2021, CFS filed petitions on behalf of the children pursuant to section 300, subdivisions (b) (failure to protect), (c) (emotional abuse), and (j) (abuse of a sibling). The petitions were later amended on June 14, 2021, to add domestic violence allegations against both mothers.

The children were formally detained from C.R. at the April 9, 2021, detention hearing, and maintained with A.H. on the condition that no corporal punishment be used on the children. C.R. was provided with weekly supervised visits, and both mothers were advised against making disparaging remarks to the children.

CFS recommended that the petitions be sustained, the children be maintained with A.H. under a family maintenance plan, and that C.R. be provided with reunification services. A.H. denied physically or emotionally abusing the children. A.H. believed the allegations stemmed from C.R.'s false reports to CFS and law enforcement to gain primary custody of the children. A.H. also believed that C.R. suffered from an

undiagnosed mental health disorder which impaired her ability to provide adequate care and protection for the children. A.H. noted that she had observed C.R.'s extreme mood swings and anger. A.H. also reported several incidents of domestic violence during her domestic partnership with C.R., including a 2008 incident in which C.R. hit and choked A.H., resulting in C.R.'s arrest.[7] A.H. recalled another incident in November 2020 in which C.R. hit her in the face while she (A.H.) was holding R. S. intervened during this incident by pulling C.R. away. A.H. believed the children suffered serious emotional damage due to the custody battle between her and C.R.

C.R. denied any untreated mental health issues or difficulties regulating her emotions. She also denied she was in a registered domestic partnership with A.H. or that A.H. was named as a parent on the children's birth certificates.[8] She further denied that the children suffered emotional abuse because of the custody dispute between her and A.H. C.R. claimed that A.H. used excessive physical discipline on the children and was the cause of S.'s emotional issues. C.R. acknowledged she had previously been arrested for domestic violence.

On April 29, 2021, the children's attorney requested the children be removed from A.H.'s care based on S.'s disclosures of physical abuse in the home. The court granted

---

[7] C.R.'s criminal history indicated that she had domestic violence charges in 2006 for infliction of corporal injury to a spouse or cohabitant and a 2008 charge for battery on a spouse.

[8] Both A.H. and C.R. were named as the children's parents on the birth certificates.

the request, detained the children from A.H.'s care, placed them in a foster home, and offered the mothers predisposition services.

By June 2021, S. continued to exhibit emotional issues and was placed on a psychiatric hold for stabilization following his visit with A.H. on June 5. During the visit, S. refused to participate in the visit with A.H. and was asked to sit separately so that A.H. could visit R. When S. overheard A.H. stating that she needed the iPad returned from S., S. had an emotional breakdown. He began to hit his head on the wall, throw toys, mix playdoh containers, and swing a small plastic golf club. Despite efforts to de-escalate the child, S. continued to slam himself against the wall and fall to the ground. After CFS transported the child to a hospital for an evaluation of the physical injuries he had sustained from slamming into the wall, S. was placed on a psychiatric hold and remained hospitalized until June 16, 2021. After A.H. recovered the iPad, it was discovered that S. was having unauthorized and unsupervised contact with C.R. A.H. showed CFS text messages between S. and C.R., in which C.R. tells S. to delete the text messages. The child also used the iPad to watch pornography and communicate with an unidentified individual about his wish to commit suicide.

CFS was also concerned about C.R.'s mental health as she was unable to regulate her emotions and behaviors. In addition, she continued to deny responsibility for her actions and did not believe her behavior affected the children. Regarding the predisposition services, C.R. had begun individual counseling. However, her therapist reported that C.R. was not taking any responsibility for the case, required extensive

services, and requested additional sessions in advance. CFS was concerned that S.'s disclosures were influenced by "at least one parent." CFS noted that while S. maintained A.H. physically abused him, he also had a pattern of disclosing abuse while changing some details and recanting the allegations. In any event, CFS believed S.'s emotional and mental state required protection and recommended reunification services for A.H. and C.R. CFS noted that C.R. would benefit from a psychological evaluation to identify untreated mental health issues and to determine the appropriate treatment.

On June 22, 2021, CFS applied for psychotropic medication on S.'s behalf for "acute stabilization." C.R. disagreed with the administration of medication explaining that "[S.]'s behavior has changed because of [A.H.] . . . abusing him over and over in different ways and he's having a hard time being around her."

On August 3, 2021, the mothers participated in mediation. A.H. reached an agreement, but C.R. continued to disagree with the allegations and disposition.

By August 18, 2021, C.R. continued to engage in predisposition services and had completed individual counseling, parenting classes, and a domestic violence program. However, C.R.'s domestic violence service provider indicated that C.R.'s progress was "[g]uarded" as she required additional sessions to "complete the book, . . . a safety plan and a[n] exit letter." CFS was concerned that C.R. had not benefited from her services as she continued to fail to take responsibility for her role in the acts of domestic violence and demonstrated stalking conduct by appearing excessively early at visits to observe

8

A.H. CFS thus recommended that C.R. complete an additional domestic violence course for perpetrators.

The contested jurisdictional hearing was held on August 19, 2021. After C.R.'s testimony and argument from the parties, the juvenile court found true some of the allegations in the amended petitions as modified and dismissed some of the allegations. The court found both C.R. and A.H. to be the children's presumed mothers and continued the matter for a contested disposition hearing.

By October 13, 2021, C.R. continued to participate in services, including parenting, individual counseling, and domestic violence. C.R. also completed a psychological evaluation with Dr. Brodie. Dr. Brodie diagnosed C.R. with "Partner Relational problem," and concluded that C.R. would need to focus on "effective coping with the relational stress, and managing her emotions and behaviors that may [be] triggered if she continues to co-parent with [A.H.]." Dr. Brodie noted that C.R. would benefit from "Dialectical Behavior Therapy (emotion regulation and distress tolerance)." Dr. Brodie recommended "individual therapy to build assertive communication" in conjunction with "treatment focused on assertive communication and interpersonal effectiveness skills" to address C.R.'s difficulties with self-reflection and acknowledgement of responsibility. Dr. Brodie noted no specific mental health issues that would prevent C.R. from benefitting with services. However, Dr. Brodie stated that continued domestic violence between C.R. and A.H. would present a risk to the children's safety. Dr. Brodie thus recommended specific risks and consequences of domestic

violence and ongoing domestic disputes be identified for C.R. in writing. Dr. Brodie further noted that C.R. would also benefit from additional coaching and parental support groups.

The contested dispositional hearing was held on October 29, 2021. At that time, C.R.'s counsel argued there was insufficient evidence to remove the children from her care and requested the court place the children back in her care under a family maintenance plan. The juvenile court denied the request, noting that although C.R. had received a positive psychological evaluation and there was no impediment for her ability to benefit from services, "[the court] [had] no information regarding [C.R.] that she's accepting any responsibility for the true findings." The court noted that therapy for C.R. was still left on her case plan and "possible PCIT [Parent Child Interaction Therapy]." The court declared the children dependents of the court, removed them from parental custody, and provided the mothers with reunification services and supervised visits.

C.R. subsequently appealed, challenging the removal order. We rejected C.R.'s contentions and affirmed the order. (*R.H.*, *supra*, E078019.)

By the six-month review hearing in April 2022, A.H. had made progress in her case plan. CFS thus recommended the children return to A.H. with family maintenance services and that reunification services be continued for C.R. C.R. continued to not take responsibility for her actions and continued to deny that she did anything wrong. She was inappropriate during visits and failed to redirect S.'s incorrigible behavior. CFS and therapists had concerns for C.R.'s behaviors and her mental health. C.R. also sent

10

alarming texts and emails to CFS, as well as to her therapist. C.R. continued to have animosity towards A.H.

The six-month review hearing was set contested, but due to timing and the need for additional information from A.H., the matter was continued and set for a contested 12-month review hearing.

At the June 28, 2022, contested 12-month review hearing, the juvenile court maintained the children in their out-of-home placements and continued reunification services for both mothers.

By the 18-month review hearing, CFS recommended return of the children to A.H. with family maintenance services, and that reunification services for C.R. be terminated. C.R. still had not completed individual counseling sessions and had not started family sessions.

The children were placed on a 29-day extended visit with A.H. at the 18-month review hearing on September 27, 2022, and the matter was set contested on behalf of C.R.

The contested 18-month-review hearing was held on December 5, 2022. The juvenile court ordered the children returned to A.H. and terminated C.R.'s services. C.R. was provided with supervised visits once a week for four hours.

On April 20, 2023, a section 342 subsequent petition was filed on behalf of both children due to domestic abuse between A.H. and her partner, and S.'s increasingly aggressive behaviors.

11

The children were detained at the April 21, 2023, detention hearing on the subsequent petition.

CFS recommended the children be placed in out of home care, that no reunification services be provided to either parent and that the permanent plan of placement in foster care with a plan of adoption be ordered. CFS later recommended that the children remain in out-of-home care and a section 366.26 hearing be set. R.'s caretakers desired to provide legal permanency for both the children, even though S. was not placed in the same home due to a capacity issue. S. continued to struggle with emotional behaviors.

The jurisdictional/dispositional hearing was set contested on behalf of both mothers on August 10, 2023.

CFS continued to recommend that a section 366.26 hearing be set as to R., and that S. remain in out-of-home care with the goal of adoption with R. when appropriate. CFS was concerned about C.R.'s ability to care for both children and her mental health to safely parent the children.

On November 2, 2023, C.R. filed a section 388 petition, seeking return of both children and family maintenance services. CFS recommended that C.R.'s section 388 petition be denied as the proposed order was not in the children's best interests. CFS explained that C.R. had not benefited from the services she had received as evidenced in her irrational interactions with others, her lack of parenting when given an opportunity,

her inability to discuss the cycle of domestic violence and declining to participate in services when asked.

The contested jurisdictional/dispositional hearing on the subsequent petition was eventually held on February 27, 2024. The juvenile court found true the allegations in the petition, declared the children dependents of the court, ordered reunification services as to A.H. terminated, and then ordered services to both parents under the permanency planning program. The court ordered unsupervised visitation for C.R. once a week for two hours with CFS having the authority to increase frequency and duration.

On May 13, 2024, CFS filed a section 388 petition, asking the court to revert visits with C.R. to supervised one time a week for two hours, due to R. regressing in potty training and engaging in aggressive behavior.

By August 2024, CFS recommended that R. remain in out-of-home care with the permanent plan of placement in foster care with the plan of adoption and that services be terminated for the mothers. R., who was five years old at the time, was not meeting his developmental milestones, and had behavioral issues following visits with C.R. There were multiple concerns and issues with C.R.'s visits and the lack of progress in C.R.'s therapy. CFS noted the negative issues R. began experiencing after his visits went to unsupervised with C.R.

At a hearing on August 16, 2024, C.R.'s counsel asked to set the hearing "as it pertains to the visitation request by the Department" and objected to R.'s visits being monitored. Counsel objected to a modification in visitation without the filing of a

section 388 petition and notice, contending it was a due process violation. Counsel noted she wanted the social worker, the social worker's supervisor, and both children available for testimony. Counsels for the children and CFS argued that a section 388 petition is not required to modify a visitation order and asked that the court make a detriment finding. The juvenile court indicated it was not inclined to make a detriment finding at the hearing, but indicated supervised visits were necessary at that time and they would hear testimony on the impact of visits with the children. The court set a pretrial settlement conference to work out witness lists, discovery and other issues that may concern counsel, and noted its understanding of counsel's goal in setting the hearing is return of the children to the mothers and the court was setting the hearing for that purpose.

C.R. submitted exhibit and witness lists on October 8 and 17, 2024, noting the intention to call both mothers, R., a therapist, and three CFS employees. The exhibit list included 13 items, mainly delivered service logs.

CFS continued to recommend that services to both mothers be terminated, and that R. remain in out-of-home care with the permanent plan of adoption. R.'s encopresis and enuresis had increased. R. appeared to have panic attack type behaviors when being transported to visits with C.R. CFS provided detailed notes of some visits between C.R. and R. CFS concluded that returning the children to either mother would create a substantial risk of detriment to the well-being of the children, because the mothers had failed to benefit from the court-ordered case plan and reunification services.

14

The contested planned permanency review hearing was held on October 17, 2024. Before hearing evidence, the court emphasized that it had nothing before it justifying return or justifying the fact that the children were stabilized and ready for return, and that was what the juvenile court desperately needed. The court noted its desire to authorize conversion of visits to unsupervised visits but could only do that once there is assurance of stabilization of the children. The court encouraged the parties to work together before the next court date and the parties indicated they would work together.

The in progress contested planned permanency review hearing continued October 21, 2024. No agreement was noted between the parties and the hearing progressed as contested. CFS's reports and the evidence previously submitted by C.R. were accepted into evidence. Counsel for Mother called the social worker to the stand to testify. In general, the social worker testified as to C.R.'s parenting skills during visits and the boys' developmental and behavioral issues. The court continued the hearing to December 20, 2024, for further testimony.

On December 20, 2024, CFS filed an additional report to the court (6.7 Report), noting that R. continued to defecate and urinate prior to, during, and after C.R.'s visits. The report further noted C.R.'s lack of understanding of R.'s developmental age of three versus his actual age of five. CFS recommended that R. remain in his concurrent planning home with a plan of adoption and a section 366.26 hearing be set.

The further contested planned permanency hearing was held on December 20, 2024. The juvenile court noted there were protracted discussions off the record. The

15

court also stated that it read the transcripts and all the relevant discovery and decided that it already understood that the children loved their mothers and wanted to visit with their mothers. The court determined that it wanted to tailor the issue to psychological evaluations and expert testimony focusing on visitation, not return. The court's concern was for the stability of the children. Noting it might be an appellate issue subject to reversal, then stated its inclination to suspend the hearing and not make a detriment finding on visitation at that point. The children's counsel agreed with the court, stating the same issues would be before the court at the section 366.26 hearing, arguing the court was the finder of fact and could determine when it heard the evidence. Counsel for A.H. objected to the setting of a section 366.26 hearing but indicated the current hearing was regarding visitation and asked that the hearing be continued.

C.R.'s counsel asserted the 6.7 Report was untimely as it was filed that morning and objected to the court relying on the report. Counsel asked for an opportunity to cross-examine the individual who wrote the report and objected to a suspension of the hearing and raised the court's previous request for additional witnesses, which counsel had subpoenaed. Counsel further asserted concerns with C.R.'s therapy and the observation of her visits and stressed the importance of hearing testimony from C.R.'s therapist. Counsel noted that in August 2024, CFS recommended termination of services and that R. remain in out-of-home care with the permanent plan of placement in foster care with a plan of adoption, recognizing it was the same recommendation as CFS made in the 6.7 Report. Counsel stressed her client was entitled to a hearing under

16

section 366.3, noting the court granted the hearing and that the court had not heard all the evidence to that end. Counsel argued the court was essentially asking for a directed verdict, but since the court had not heard all the evidence it was not appropriate at that time. Counsel stressed that it was a violation of C.R.'s due process rights.

CFS's counsel argued the court had two choices in the case, either return to the parents or set a section 366.26 hearing. Counsel argued the court had the authority to determine it had sufficient evidence before it to decide, noting the services were discretionary at that point and the court's decision would not violate any due process rights. Counsel then asked that the prior planned permanency hearing reports and 6.7 Report be accepted into evidence. Counsel asserted the recommendation in the 6.7 Report was different from the previous recommendation in asking to set a section 366.26 hearing. The 6.7 Report was accepted into evidence over the objection of C.R.'s counsel.

Following argument from all counsel, the court stated its understanding that C.R.'s counsel wanted the court to hear further testimony regarding length of visitation but noted it would not have resulted in the court affirmatively saying return of the children. The court stated its only focus was on the children's best interest and noted it was not trying to violate due process or "hamstring people from testifying." The court understood the mothers loved their children and wanted to visit them more, but emphasized this was not the issue. The issue was whether the children could safely be returned to their parents and the answer was no. The court then found that R.'s placement was necessary and

appropriate and set a section 366.26 hearing to determine the most appropriate plan for the children and consider termination of parental rights. The court clarified this was as to R. only. The court also found CFS complied with the case plan by making reasonable efforts and found CFS had exercised due diligence to locate appropriate relatives for placement. C.R. timely filed a notice of intent to file a writ petition.

In her writ petition, C.R. argued she was denied her constitutional due process right when the juvenile court refused to allow C.R. to continue to challenge CFS's recommendation and thereby denying her a contested hearing. We rejected this argument and denied C.R.'s petition. (*C.R.*, *supra*, E085273.)

CFS's observations of visits between R. and C.R. showed that they loved each other and that R. was affectionate with C.R., he hugged her and run up to C.R. at visits. After one visit, R. said he did not want "mommy to go" and was reassured when told he would see C.R. next week. However, later in October 2024, R. had mixed reactions to C.R., and the visit was described as "ok" and R.'s negative behaviors increased at home and in school. In addition, after visits, R. was able to easily separate from C.R. and walk to his caregivers, Mr. and Mrs. S. R. had resided with Mr. and Mrs. S. since April 18, 2023. The social worker opined that the visits were appropriate, but C.R. did not parent R. and they were more like brief playdates. Overall C.R.'s visits were described as appropriate, but C.R. struggled with being present and felt wronged.

After unsupervised visits with C.R., R.'s caregiver reported that R. reverted to whispering instead of talking out loud. C.R. told R. several times she would treat him as

18

if he were five and began visits by telling R. that she was "the best mommy ever" and he was lucky to have her. C.R. also ignored the admonishment that electronics were not allowed during visits. CFS noted that R. began having accidents since the inception of unsupervised visits even though he had previously been potty trained. CFS also noted other behavioral changes that occurred after unsupervised visits were initiated including uncharacteristic anger towards people with whom he was previously affectionate. He hit A.H. and told her he was not allowed to talk to her anymore. He also stopped displaying joy in activities he previously enjoyed like going to school, learning, and playing with other children. And he began hitting other children in the home and at school and he had also hit and spat on his teachers. He also hit Mrs. S. for the first time and pinned down a younger child in his foster home. R.'s encopresis and enuresis had also increased.

C.R. had completed individual therapy with Dr. Werderman and recently started family therapy. C.R. was not applying what she learned and not personalizing the information covered in therapy. Dr. Werderman observed "noticeable executive dysfunctions." C.R. did not make progress and her prognosis was poor. Dr. Werderman reported that C.R. took responsibility for her actions that led to the removal of the children but did not address the components of the cycle of violence, or her psychological evaluation in full. S.'s therapist noted C.R. was saying the rights things but not implementing them when given the opportunity.

A.H. completed both individual counseling and family therapy with positive reports. A.H. was described as making progress on and off in individual therapy. She

completed a domestic violence program and was participating in family counseling to the extent possible as she was still homeless. A.H.'s visits appeared to go well with R. However, at a visit with A.H. in April 2024, R. became upset at one point and pulled her hair. He was able to regain his composure but struggled throughout the visit. A.H. expressed concern about R.'s deteriorating behavior. She disclosed that R. continued to tell her that he could not talk to her or did not want to. This was a new behavior and different than his behaviors at visits with A.H. in the past. At a visit in June 2024, R. attempted to kick A.H.'s feet. Mrs. S. disclosed that C.R. told R. that he was not allowed to talk to A.H. or Mrs. S. CFS was concerned that C.R. presented no observable change in her behaviors with her becoming argumentative when angry or frustrated. C.R. contacted A.H.'s aunt who lived in Texas to complain that A.H.'s mother was manipulating the case and insisted that A.H. was "beating" the children and "stealing" them from her. According to CFS, C.R. had not demonstrated any change in her behaviors.

R. was not meeting his developmental milestones in language development, social functioning, sensory processing, or overall development. He began to whisper when stressed and was referred to the Inland Regional Center (IRC) and the Inland Empire Autism Assessment Center of Excellence (AAC). On June 26, 2024, the AAC reported that R. was diagnosed with mild intellectual disability, articulation problems, anxious presentation, and enuresis/encopresis.

By April 7, 2025, CFS recommended parental rights be terminated. R. was up to date on his well-child exams, immunizations and dental exams. Mrs. S. intended to seek additional services through Applied Behavioral Analysis (ABA) therapy for R. and have him assessed for Supplemental Security Income (SSI). R. had global developmental delay, and the school district psychologist noticed R. had difficulty with communication and adaptive skills. He was talking more and enjoyed riding bikes, blowing bubbles, playing with hot wheels, coloring, and playing with other children. Mrs. S. reported R. was making progress academically.

R. was placed with Mr. and Mrs. S. for about four weeks in September 2022 prior to being returned to A.H. and then replaced with them on April 18, 2023, where he remained for over two years. R.'s attachment to Mr. and Mrs. S. had grown as they had cared for R. for much of his young life. R. was considered part of Mr. and Mrs. S.'s family and they desired to adopt him. R. called them " 'mom' " and " 'papa.' " R. identified the other children in the home as his siblings. R. was comfortable in the home, expressed that he felt safe in the home and liked living there. R. had a limited understanding of adoption due his young age and level of development but was able to express that he wanted to live with Mr. and Mrs. S. " 'forever.' " The social worker observed R. to be very bonded, loved, and secure with Mr. and Mrs. S.

On April 16, 2025, C.R. filed a section 388 petition requesting the court take the section 366.26 hearing off calendar and order six additional months of reunification services. C.R. continued to visit with R. and a bonding study had been completed. C.R.

21

argued that R. was substantially bonded to her, she alleviated the issues that brought the matter before the court, her visits were appropriate, and she could work with R.'s service providers to ensure R. received the support he needed. The April 14, 2025 bonding study, conducted by Dr. Rogers, was attached to C.R.'s section 388 petition. Counsel for C.R. informed Dr. Rogers that the court sustained allegations of emotional abuse against C.R. for withholding R. from A.H. Counsel indicated that she believed C.R. was ready to have R. returned to her care and that CFS was not doing so because R. was diagnosed with a learning disability and was urinating and defecating on himself.

For the bonding study Dr. Rogers was provided visitation observation records, the neurodevelopmental evaluation report from when R. was five years old, an updated "question and answer" letter, and the initial petition. C.R. also completed a report regarding her observation of R. at Dr. Rogers's request. Dr. Rogers did not review every page of the visitation logs. Instead she conducted word searches for cry, crying, cried, pee, peed, poop, pooped, diaper, C.R., R., supervised, and unsupervised. She then focused on important time markers and reviewed selected documents. She acknowledged it was possible she missed some relevant data. Dr. Rogers observed a two-hour visit on March 21, 2025. During the visit Dr. Rogers did not observe any maladaptive behaviors. She concluded that R.'s intellectual disability was not causing his enuresis/encopresis and that this behavioral regression was related to some kind of stress in the school setting. She also concluded that C.R.'s limited parenting time was completely unrelated to R.'s intellectual disability. Dr. Rogers believed the causal link between R.'s

22

enuresis/encopresis and C.R.'s visits was "exceedingly thin." Dr. Rogers opined R. was clearly attached to C.R. and that his relationship with her was important based on R.'s statements to different people that he thought he might never see C.R.

Citing *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), Dr. Rogers analyzed whether the parental-benefit exception applied. Dr. Rogers stated R.'s benefit from the relationship was more than incidental and termination would pose a detriment. R. was diagnosed with intellectual disability and language difficulties and was therefore more vulnerable than the average six-year-old. R. had also expressed fear that he would never see C.R. again. Dr. Rogers opined that R. had a bond with C.R. prior to removal and his significant positive emotional attachment continued while he was apart from her. Relying on C.R.'s reporting, Dr. Rogers concluded that C.R. and A.H. were now cooperative and could successfully co-parent. Based on the visitation logs, Dr. Rogers believed there was less contention between C.R. and A.H. and the earlier derogatory statements were not coming from C.R. Dr. Rogers concluded that R.'s behaviors were due in part to the length of the case and predominantly related to his developmental level and that fear of not seeing C.R. showed that he would be destabilized and traumatized by her loss. The relationship with C.R. was not so intense that it would prevent him from forming or maintaining relationships with others including Mr. and Mrs. S. Dr. Rogers's study was limited because she was unable to speak with R., his teachers, Mr. and Mrs. S., his speech therapist, or A.H. and was provided with limited documentation.

23

CFS recommended that the juvenile court deny C.R.'s section 388 petition because it was not in R.'s best interest. The social worker noted that C.R. was more animated and spoke louder at the March 2025 visit that Dr. Rogers observed. She also noted that C.R. allowed R. to take two "uncrustables" home with him but normally she did not allow R. to take the things she gave him home. CFS included documentation of several other visits through June 21, 2025. A third-party monitor was present at some of those visits and provided independent documentation of those visits. At an April 5 visit, C.R. was described as being animated at these visits and R. was described as having a blank stare and being quiet. The April 26 visit was supervised by another social worker who refused to allow the third-party monitor to participate because the paperwork did not reflect that she could be present. The third-party monitor was described as upset and speaking with a loud voice. The monitor stormed out of the office indicating that the social worker would hear from her lawyer. When told to put her phone away during the visit, C.R. got upset and began to slam things. R. reacted with a concerned look and would flinch when C.R. slammed things. C.R. presented as angry and upset. She then threw a toy into her bag. The visit ended an hour early. The May 10 visit was supervised by two social workers. C.R. again tried to use her cell phone and was admonished that electronics were not allowed during visits, otherwise there were no concerns. The May 24 visit also ended early after C.R. informed the supervising social worker that she had a family emergency. R.'s schedule was adjusted based on this new information. During the visit C.R.'s speech was calm, but her behavior was erratic. When asked about ending the visit at the time

C.R. requested, C.R. became increasingly agitated. When the visit finally ended, the social worker escorted C.R. to the parking lot and had to tell her to leave the property. The third-party monitor attended the June 21 visit. The third-party monitor insisted on watching R. use the bathroom despite being told it was not necessary and being asked to leave the restroom. After the confrontation, the social worker told the third-party monitor that she was no longer allowed to be part of the visit and asked her to leave the building. Security was called to assist. When the social worker asked C.R. to proceed to the visitation room and take R. to a safe location, C.R. declined stating that the incident needed to be documented. The visit was terminated as a result.

As to the bonding study, CFS noted that it only included the last year of the case records. CFS also noted that Dr. Rogers did not consider C.R.'s mental health issues. Instead, the bonding study attributed the decision not to return R. to C.R.'s care to his learning disability and enuresis/encopresis when the actual reason was C.R.'s mental health concerns, her behavior at visits, and R.' reaction to those behaviors. CFS disagreed with Dr. Rogers's conclusions about R.'s reaction during visits and that the cause of some of his behaviors was related to school.

On July 2, 2025, supervised visits with C.R. were ordered once per month for two hours. The section 366.26 and the section 388 petition hearings were continued to September 8, 2025, and a contested hearing on visitation was set for August 26, 2025.

CFS recommended C.R.'s visits remain once per month. At a July 26, 2025, visit it was noted that R. did not have any bathroom incidents since C.R.'s last visit on

25

June 21, 2025, but did urinate on himself at the July 26 visit. CFS disputed the accuracy of the third-party monitor's visitation notes and believed they lacked behaviorally specific details. CFS believed the third-party monitor was not a neutral observer.

At some point prior to the contested hearings, the court denied C.R.'s section 388 petition for failure to state new evidence or changed circumstances and because a contested section 366.26 hearing was already set. On October 20, 2025, C.R. filed a notice of appeal challenging the denial of her section 388 petition.

CFS noted that R. enjoyed his visits with A.H. and easily separated from her. He did not ask to visit her during the week. CFS opined that R. did not have a substantial positive emotional attachment to A.H. that he would benefit from maintaining. A.H. had not had an in-person visit with R. in the last three months. CFS also believed that the sibling bond was not sufficient to derail the termination of parental rights.

The August 30, 2025, visit with C.R. occurred without incident. It was noted, however, that R. urinated on himself twice after the visit. He also urinated on himself at school when he thought C.R. would be contacted because he associated the word "mommy" with C.R. The September 6, 2025, visit occurred without incident. However, there continued to be issues with the use of electronics during the visit.

The contested hearings began on September 8, 2025, and were heard on several days over several months. The court declined to connect R.'s enuresis/encopresis to C.R.'s visitation absent additional evidence establishing a nexus.

26

Mother's retained third-party visitation monitor testified first. She described C.R. as prepared for the visits. She brought breakfast and two large bags with her with things to do like crafts, books, and other things to play with. She testified that R. "communicates with his mom" during visits and used an example where he told C.R., "look at my outfit" and asked if she liked his shoes. She did not have a baseline regarding how much he talked. R. urinated on himself once during a visit she monitored. She did not observe any distress when R. greeted C.R. and testified that he usually gave her a hug. She described C.R. as positive and encouraging of R. She did not know if R. became sad at the end of visits but noted that he did not cry when visits ended. She described herself as a neutral observer. She did not observe R. acting out at visits.

A.H. testified that she did activities with R. during visits, such as painting, going outside, and doing things R. liked. A.H. noted that R.'s speech improved and he spoke in full sentences during visits. She believed she had a strong bond with R. and noted that when in the presence of Mrs. S. R. called her mommy.

After A.H. testified, the contested hearing was continued and the court authorized Dr. Rogers to observe a second visit.

Dr. Rogers provided a supplemental report to the court on October 20, 2025. She observed a second visit and considered additional documents filed after her initial bonding study report. She took issue with the social worker's criticism of her initial report. She discussed the different observational tones of the different people observing the visits. She observed that R. was much more verbal compared to her first

27

observational visit and his language showed remarkable improvement. Dr. Rogers concluded that the visits were more than play dates and established a substantial positive emotional attachment emphasizing that C.R. brought clothing, hygiene items, gifts, and prepared food. She could not say whether termination of the relationship with C.R. would be more or less detrimental to R. because of the anger C.R. displayed. She maintained that it was not appropriate to blame R.'s enuresis/encopresis on C.R.

Dr. Rogers testified that she had scanned the records and conducted word searches such as "peeing, pooping, diapers, crying, visitation, monitored, unmonitored" to identify important events where problems were mentioned. She did not interview R. and did not review every CFS record. She also did not interview Mrs. S., but she focused on the issues and dates highlighted by C.R.'s attorney. Nevertheless she believed she had enough information to make conclusions about the parent-child bond between C.R. and R. She took into consideration R.'s development, and that he had "an intellectual deficit" with significant receptive and expressive language difficulties. She maintained that R.'s enuresis/encopresis was not attributable to C.R.'s visits because there were competing and contributing concerns such as school and "transitions." She could not say R. never wet the bed in reaction to a visit with C.R. or whether it was anticipatory of C.R.'s visits. Dr. Rogers concluded that R. would benefit from continuing the relationship with C.R. and identified her as "mommy." She also noted that the records she reviewed reflected that he had three moms including A.H. and Mrs. S. However, she was unable to determine with which mother, if any, he had a stronger bond. She believed R. had no

28

memory of living with C.R. or A.H. and all he recalled was the life with Mrs. S. She was surprised in R.'s development over the last six months and could not say whether it would be better for R. to be adopted or not. She could not speak to the relationship or bond R. had with Mrs. S. and had limited things to say about A.H. Dr. Rogers believed R.'s emotional attachment was growing and important to him and he saw C.R. as a parent. She referenced *Caden C.* and the "intensity" of the child's bond such that a child is unable to form a bond with anyone else. She concluded that level of intensity did not exist in this case noting that he formed a relationship with Mrs. S. She concluded that C.R. had a reasonably good bond with R., which was respectful of his other bonds. She believed based on his developmental level that he had enough of a bond with C.R. that it would be detrimental to him if C.R. were to "disappear" and he would be at risk for certain emotional problems. As for Mrs. S. Dr. Rogers stated, "I would infer reading between the lines that there is a connection there . . . I would say much of his remembered life has been with Mommy Trish and Papa [Mrs. S. and Mr. S.]." Dr. Rogers explained stability and predictability were the most important thing for a young child and the stability of his living situation helped mitigate the conflict from the initial removal.

After Dr. Roger's testimony the matter was continued to December 11, 2025.

CFS spoke with R. about adoption in November 2025. R. said adoption was good because he would be able to stay with Mrs. S. He wanted to be adopted and appeared happy discussing being adopted with another child that was adopted by Mr. and Mrs. S.

29

On December 11, 2025, the court accepted stipulated testimony from R. taken on August 21, 2025, that he had "a Mommy [Mrs. S.], a Mommy [C.R.], and a Mommy [A.H.]." He liked living with Mrs. S. because he loved her and because she hugged him at bedtime. He liked Papa [Mr. S.] "a lot of bit." He liked visiting C.R. because she gave him snacks. He was happy during visits with [C.R.] and liked visiting [A.H.] because "she always ma[de] [him] fried rice." He wanted to live with both [Mrs. S.] and his moms.

C.R. and the social worker also testified. In relevant part, C.R. testified she was R.'s biological mother and her visits had been reduced to once a month about three to four months ago. Prior to that, she visited R. once a week throughout the case and that she had unsupervised visits with R. for about six months throughout the case. R. hugged her tight at the beginning of visits and they did activities together and ate during visits. R. enjoyed their time together and did not want visits to end. They had a wonderful and delightful relationship. R. called C.R. "mom" or "mommy."

A.H. called the social worker as a witness. In pertinent part, the social worker testified she had been assigned to the case since April 2021 and had observed A.H.'s visits with R. Overall, their visits were very pleasant. A.H. would engage with both R. and S.H. The social worker opined R. and A.H.'s visits were like play dates. A.H. read and sang to R. and they did activities together. R. called A.H. "mom" and greeted her with a hug. A.H. stopped in-person visits after she was hospitalized several times and had no transportation.

30

After hearing argument by the parties, the juvenile court found R. to be generally and specifically adoptable. As for the parental-benefit exception, the court found that both mothers met the first prong of regularly visiting R. The court did not attribute R.'s enuresis or encopresis to C.R.'s visits. The court considered factors related to the second and third prongs. The court also considered R.'s wishes and found R. had a bond with C.R. and A.H. However, the court found adoption outweighed the benefits of maintaining the parent-child bonds. After analyzing the *Caden C.* factors, the court found the parental exception did not apply and terminated parental rights. C.R. and A.H. filed timely notices of appeal.

## III.

## DISCUSSION

A. *Summary Denial of Section 388 Petition*

C.R. contends the juvenile court abused its discretion in summarily denying her section 388 petition because she made a prima facie showing of changed circumstances and best interest of the child. We disagree.

A parent may petition the juvenile court for modification of a prior dependency order. (§ 388, subds. (a), (c).) To obtain the modification, the petitioner must show by a preponderance of the evidence that there has been a change of circumstances sufficient to warrant the changed order, and also that the new order would be in the child's best interests. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532-535 (*Kimberly F.*).)

31

The juvenile court must order an evidentiary hearing on the petition only where "it appears that the best interests of the child . . . may be promoted by the proposed change of order." (§ 388, subd. (d).) "To obtain a hearing on a section 388 petition, the parent must make a prima facie showing as to both elements." (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 7.) "The conditional language of section 388 makes clear that the hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order, which necessarily contemplates that a court need not order a hearing if this element is absent from the showing made by the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806-807, fn. omitted.)

"Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.] The petition must be liberally construed in favor of its sufficiency." (*In re J.P.* (2014) 229 Cal.App.4th 108, 127; accord, *In re K.L.* (2016) 248 Cal.App.4th 52, 62 (*K.L.*).)

" 'A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its

32

sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best interests.' [Citation.]" (*K.L.*, *supra*, 248 Cal.App.4th at pp. 61-62; *id.* at p. 62 ["Significantly, Mother did not allege that any of the children's current or prospective placements [were] inadequate."].) "To support a section 388 petition, the change in circumstances must be substantial. [Citation.]" (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

"After termination of services, the focus shifts from the parent's custodial interest to the child's need for permanency and stability. [Citation.]." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.) "[A]nd in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

We review a juvenile court's decision to summarily deny a section 388 petition for abuse of discretion. (*K.L.*, *supra*, 248 Cal.App.4th at p. 62.) "We must uphold the juvenile court's denial of [a] section 388 petition unless we can determine from the record that its decisions ' "exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "It is rare that the denial of a section 388 motion merits reversal as an abuse of discretion." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.)

C.R.'s section 388 petition requested additional reunification services and that the section 366.26 hearing be taken off calendar. She alleged that R. was substantially bonded to her, she alleviated the issues that brought the matter before the court, her visits were appropriate, and she could work with R.'s service providers to ensure his needs were being met. On appeal, C.R. argues that she "demonstrated a meaningful period of engagement with therapy and impactful and loving visitation, reunification services were rightfully requested at this moment." However, C.R. fails to explain how she had addressed her inability to take responsibility for her actions leading to CFS intervention and to recognize the impact her behavior had on her children. She believed she did nothing wrong and continued to display erratic behaviors. Despite participating in her case plan components and continuing in therapy, her mental health remained a concern and there was little evidence showing she had benefitted from the services she had received. The juvenile court noted at an earlier hearing that C.R. did not make substantive progress or take responsibility for her part in the case coming before the court. Although C.R. made moderate progress and eventually took responsibility for her actions, had over 20 months of court-ordered services, and continued to participate in services after services were terminated, there is no evidence to suggest she benefitted from the services she received or resolved the issues that led to the removal of the children. C.R. continued to engage in concerning behaviors and failed to address her mental health and domestic violence issues.

Four months had passed between the termination of services under the permanency planning and the filing of her current section 388 petition in April 2025. The April 2025 section 388 petition did not include any updated letters or reports from any service providers after the termination of services provided under the permanent plan. C.R. cites no support for her assertion that she was actively addressing her mental health at the time the section 388 petition was filed or how her actions impacted R.

C.R. argues that the bonding study addressed the central concerns raised in the dependency case which she claims were R.'s intellectual disability and his ongoing enuresis and encopresis. While these were certainly issues to be addressed during the dependency case and related directly to the parental-benefit exception to the termination of parental rights, they bore little relevance to the issue of providing additional reunification services to C.R. CFS made clear that the basis for not returning R. to C.R.'s custody and thus terminating services to C.R. was her mental health, her behavior at visits, and R.'s reaction to her behaviors at visits. Even if the enuresis, encopresis, and other behaviors were not related to C.R.'s visits, CFS noted that there was "no observable change in [C.R.'s] behaviors" over the four and a half years that R. was in CFS custody. She spoke negatively about the case while at visits in front of the children, was unable to regulate her anger, threw things that caused R. to flinch and appear afraid at the most recent visit, and ultimately some visits were cancelled or terminated early. The bonding study did not provide evidence that the jurisdictional issues were resolved or that C.R. had made a change in circumstances. It made no representations that C.R. had

35

rehabilitated herself such that additional reunification services were warranted or in R.'s best interest. It did not address C.R.'s progress or participation in any of the court ordered case plan components or how it would be in R.'s best interest. The bonding study solely addressed the parental-benefit exception to the termination of parental rights as evidence by Dr. Rogers's attempt to synthesize her findings with *Caden C.* C.R. failed to assert any facts that would support a prima facie showing of changed circumstances.

Moreover, C.R. has not shown the proposed order would be in R.'s best interest. C.R.'s best interest allegations did not "describe specifically how" the petition will advance R.'s best interest or how granting C.R. additional services to which she had received for over 20 months was in R.'s best interest. (*K.L.*, *supra*, 248 Cal.App.4th at pp. 61-62.) At the time C.R. filed her April 2025 section 388 petition, R. was five years old and had been with the same caregivers for about two years. R. was formally detained from C.R. in April 2021 when he was two years old and had lived with his current caregivers almost half of his entire young life. In addition, R. had extensive developmental needs which required numerous services that were already established and being met by his caregivers. Although the bonding study showed R. was attached to C.R., the record indicates R. was also attached to his caregivers and thriving in their home.

C.R.'s conclusory statement that she had a strong bond with R. did not support her claim that granting her additional services was in his best interest. By the time of C.R.'s April 2025 petition, the caregivers were not strangers but caregivers who had been caring

36

for R. for a long period of time and addressing his extensive developmental needs. As the juvenile court noted, the dependency had reached the stage of a 366.26 hearing, which meant services had been terminated for both parents. The focus at that point was the permanence and stability of the child, which was found with the caregivers with whom R. had lived almost half of his young life. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) "In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) " 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' " (*Ibid*.) There was nothing in the April 2025 section 388 petition filed by C.R. to support a prima facie case that the proposed order was in R.'s best interest.

On this record, C.R. did not establish that R.'s need for permanency and stability would be advanced by granting C.R. additional services. C.R. has already received over 20 months of court-ordered services and this dependency matter has been ongoing since 2021. It is important to keep in mind that, where, as here, the juvenile court's ruling is against the party who has the burden of proof, it is extremely difficult for C.R. to prevail on appeal by arguing the evidence compels a ruling in her favor. Unless the juvenile court makes specific findings of fact in favor of the moving party, we presume the juvenile court found C.R.'s evidence lacked sufficient weight and credibility to carry the

burden of proof. (See *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241.) The juvenile court properly summarily denied C.R.'s April 2025 section 388 petition.

B. *Parental-Benefit Exception*

C.R. and A.H. contend the juvenile court erred in failing to apply the beneficial parent-child relationship exception to adoption pursuant to section 366.26, subdivision (c)(1)(B)(i) as to R.

The purpose of the section 366.26 hearing is to select and implement a permanent plan for the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) "[I]f the court finds that the child is likely to be adopted and that 'there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan.' (*Caden C.*, *supra*, 11 cal.5th at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).)" (*In re M.V.* (2025) 109 Cal.App.5th 486, 507 (*M.V.*).) One of those exceptions is the parental-benefit exception. (*Ibid*.) The California Supreme Court has explained that the exception " 'merely permit[s] the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' [Citation.]" (*Caden C.*, at p. 631.)

The proponent of the parental-benefit exception must establish, by a preponderance of the evidence, three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the

38

termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, italics omitted.)

" 'The first element . . . is straightforward.  The question is . . . whether "parents visit consistently," taking into account "the extent permitted by court orders." ' " (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*), quoting *Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"To establish the second element, . . . the parent must show the child has a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' " (*M.V.*, *supra*, 109 Cal.App.5th at p. 507, quoting *Caden C.*, *supra*, 11 Cal.5th at p. 636.)  "The 'focus is the child,' " (*id.* at p. 508), and the court considers "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  In assessing this element, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  The relationship should be that of parent and child and not one of friends.  (*Id*. at p. 576.)

Finally, "[c]oncerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 317.) In other words, courts must determine "in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633.) "That subtle, case-specific inquiry" asks whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship' " with the parent. (*Ibid.*) " 'When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss,' " the parental-benefit exception applies. (*M.V.*, *supra*, 109 Cal.App.5th at p. 508.) "When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). . . . Accordingly, courts should not look to whether the parent can provide a home for the child." (*Caden C.*, at p. 634; see *Katherine J.*, at p. 317.)

A "substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden*

*C.*, *supra*, 11 Cal.5th at pp. 639-640; see *Katherine J.*, *supra*, 75 Cal.App.5th at pp. 317-318.)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. . . . [¶] Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640; see *Katherine J.*, *supra*, 75 Cal.App.5th at p. 318.)

In this case, at the section 366.26 hearing, the juvenile court expressly conducted the analysis under *Caden C.* on the record before finding the exception inapplicable. The juvenile court found that the mothers met the first and second prongs of the parental benefit exception. The mothers, however, disagree with the court's finding as to the third prong of the exception.

We conclude the juvenile court did not abuse its discretion in determining that adoption by committed caregivers outweighed any detriment R. might experience by losing his relationship with his mothers. At the time of the contested section 366.26

hearing, R. desired to be adopted by Mr. and Mrs. S. And although the court acknowledged a bond between R. and his mothers, he also called Mrs. S. "mommy" and wanted to remain with his caregivers and their family. R. had been in foster care since he was two years old, had been with Mr. and Mrs. S. for almost three years, and was almost seven years old by the time of the section 366.26 hearing. Except for a brief four-month period when he was returned to A.H. in early 2023, he spent almost five years in foster care. After his removal from A.H., R. was placed with Mr. and Mrs. S. for almost three years by the time parental rights were terminated. Most of his youth was spent in foster care and more time in the care of Mr. and Mrs. S. than in the care of the mothers. Moreover, R. was thriving in his caregivers' home. Dr. Rogers and C.R.'s third-party monitor acknowledged R. had improved verbal skills and spoke in complete sentences.

Although Dr. Rogers testified R. was particularly vulnerable to emotional destabilization caused by severance, the mothers did not demonstrate great harm that R. would experience. Neither Dr. Rogers nor the mothers described specific harm that R. would likely or potentially suffer from the termination of parental rights. The record shows R. would also suffer emotional destabilization if his relationship with Mrs. S was severed. We acknowledge that R. repeatedly identified the mothers as "Mommy," expressed fear that he would never see C.R. again, cried at end of visits, ran to the mothers screaming and hugging them, and consistently showed affection and connection during visitation. However, there was no evidence of detrimental loss if parental rights were terminated, particularly since R. wished to be freed for adoption and the record

shows R. had behavioral issues after visits with C.R. He had mood changes and uncharacteristic anger towards people he had previously shown affection towards. He returned from unsupervised visits whispering instead of speaking out loud and stopped using his words. R. told Mrs. S. that C.R. told him that he was not allowed to talk to A.H. or Mrs. S. Although Dr. Rogers may have concluded that R.'s negative behaviors were not attributable to C.R.'s visits, the juvenile court was not obligated to adopt those findings.

And CFS observed that Mrs. S. and R. developed mutual positive bonds. Section 366.26, subdivision (h)(1) provides that, "At all proceedings under [section 366.26], the court shall consider the wishes of the child and shall act in the best interests of the child." (§ 366.26, subd. (h)(1).) The juvenile court has a mandatory duty to determine the child's wishes, based upon the evidence. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1334; *In re Amanda D.* (1997) 55 Cal.App.4th 813, 820; *In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591.) R. expressly indicated that he wished to be adopted, even though he had an attachment to his mothers. R. deserved permanency and stability after many years of being with his caregivers.

Notably, no credible evidence demonstrated any distress upon the conclusion of visits, "which tends to support the juvenile court's conclusion that the relationship was not so substantial that its severance would be detrimental to the child." (*In re I.E.* (2023) 91 Cal.App.5th 683, 692.) Nothing in the record showed the children asked to see Mother longer or more frequently. In sum, there was no evidence of "emotional

instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression" due to R.'s separation from the mothers. (*Caden C., supra*, 11 Cal.5th at p. 633.)

Here, the juvenile court could reasonably find that any potential detriment caused to R. by the separation from the mothers may well be alleviated by the source of stability offered by his prospective adoptive parents. Mr. and Mrs. S. were committed to meeting R.'s needs and desired to adopt him. And R. was bonded to them. The court did not abuse its discretion in determining that adoption by committed caregivers outweighed any detriment R. might experience by losing his relationship with his mothers.

The evidence did not show that there would be substantial harm to R. that would outweigh the benefits of adoption. The court did not abuse its discretion in making this finding. Nothing in the record suggests R. would be detrimentally affected by having the parents' rights terminated and being adopted by his caregivers. R. was bonded to his caregivers, who had been providing him with ongoing care and love from a very young age, and had a strong, positive attachment to them. Indeed, due to his caregivers' commitment, R. was thriving in their home. The stability, security, and sense of belonging R. felt in his caregivers' home was evidenced by his emotional attachment to his caregivers, his wish to be adopted by them, and him calling them "mom" and "papa." While Dr. Rogers' bonding study shows R. was attached to C.R., the evidence in the record is clear that R. will not suffer any detriment from the termination of parental rights. Although it appeared that the mothers were appropriate during their visits and R.

was excited to see them, there is no evidence to suggest R. was in extreme distress at the conclusion of the visits. The record amply supports the court's finding adoption by his committed caregivers outweighed any detriment R. might experience by losing his relationship with the mothers.

The mothers' arguments to the contrary ask this court to reweigh the evidence and redetermine credibility issues. However, " '[i]ssues of fact and credibility are questions for the trial court.' [Citations.]" (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Given R.'s young age, his developmental issues and his preference of adoption, his need for permanency and stability was paramount. And his caregivers were willing and able to provide permanency. Although the mothers were able to maintain some parental relationship through their visitation with R. and R. had a bond with them as well, we cannot say this presents an extraordinary case where preservation of parental rights outweighs the preference for adoption. (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 [" ' "it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement" ' "].)

We express no doubt that the mothers love R., or that the mothers' visits with R. were generally positive and enjoyable for everyone. However, "[a] ' "showing [that] the child would derive some benefit from continuing a relationship maintained during

periods of visitation" ' is not a sufficient ground to depart from the statutory preference for adoption."  (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 818, quoting *In re G.H.* (2022) 84 Cal.App.5th 15, 25, italics omitted.)

In sum, the juvenile court reasonably concluded that maintaining R.'s relationship with the mothers did not outweigh " 'the security and the sense of belonging a new family would confer.' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  We therefore cannot find that the court abused its discretion in declining to apply the beneficial parent-child relationship exception in connection with R.

IV.

DISPOSITION

The orders of the juvenile court terminating parental rights as to C.R. and A.H. are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.